The NATIONAL RESEARCH DEVEL-
OPMENT CORPORATION, et al.,
Plaintiffs,

v.

VARIAN ASSOCIATES, INC., Defendant.

Civ. A. No. 89–2459 (HAA).

United States District Court,
D. New Jersey.

May 13, 1993.

John J. Francis, Jr., Shanley & Fisher,
Morristown, NJ, Charles P. Baker, John A.
O'Brien, Fitzpatrick, Cella, Harper & Scinto,
New York City, for plaintiff.

Albert E. Fey, Jesse J. Jenner, Fish &
Neave, New York City, Arnold B. Calman,
Crummy, Del Deo, Dolan, Griffinger, & Vec-
chione, Newark, NJ, for defendant.

## TRIAL OPINION

HAROLD A. ACKERMAN, District
Judge.

In 1989, plaintiff the National Research
Development Corporation ("NRDC" or
"plaintiff") brought this action against Varian
Associates, Inc. ("Varian") for infringement
of a patent. Varian's primary defense is
their contention that, for a number of rea-
sons, NRDC's patent is invalid. All issues
other than the validity and enforceability of
the Hoult patent and Varian's alleged in-
fringement have been bifurcated and stayed
for later separate trial.

Between February 9 and 23, 1993, this
court held a bench trial. The following con-
stitutes my findings of fact and conclusions of
law. As is detailed below, I will deny
NRDC's claims against Varian because its
patent is invalid pursuant to 35 U.S.C.
§ 102(b). Because of this finding, there is no
longer any need for a subsequent trial.

### I. Findings of Fact

#### A. The Background

This patent case involves the field of spec-
troscopy, the study and analysis of materials
to determine their components and molecular
structure: Nuclear magnetic resonance spec-
troscopy ("NMR") is a particular form of
spectroscopy that works by observing a ma-
terial's reaction to imposed radiation. NMR
depends on the properties of nuclear magne-
tism and operates on relatively low radio
frequencies.

NMR depends upon particular properties
of atomic nuclei. Atomic nuclei are naturally

electrically charged. This leads to a situation in which the nucleus essentially becomes a spinning magnet. In an NMR apparatus, a sample tube contains a number of atoms and molecules. Because in a sample there is an enormous number of spinning nuclei, there is no evidence of magnetism overall. However, when a sample is placed in an intense magnetic field, the nuclei will become aligned with the magnetic field—that is, they will begin to point north. As a result, the entire sample develops a small amount of magnetism.

If the experimenter then sends in a disturbance in the form of radio frequency radiation, the nuclei are first disturbed and then will return to their initial alignment. As they realign, they emit a short signal (a transient) which the experimenter can receive and analyze to determine information about the material.

To perform these experiments, an NMR apparatus normally consists of a large magnet, a material to be analyzed (often stored in a test tube), a radio-frequency pulse transmitter to excite a sample, and a radio-frequency receiver and detector, which will observe the response. Also, a device such as a computer memory is attached to the detector to store the recorded data.

NMR was independently discovered at Harvard and Stanford Universities in 1945. For the first twenty years, spectrometers would transmit radio frequency radiation continuously, while varying the radio-frequency. Modern spectroscopy, though, uses a pulsed NMR method. In pulsed NMR, radiation is applied not continuously but in short pulses. As the nuclei react, a transient, temporary radio-frequency response will follow. The transient is then received by a probe, which is connected to a component of a receiver called a detector. The detector then produces a signal whose strength varies in precisely the same manner as the strength of the detected transient. The detected transient signals generally are printed or displayed as a spectrum of marks at frequencies characteristic of the material being analyzed.

In the mid–1960s, Varian scientist Weston A. Anderson discovered a technology called Fourier transform NMR, a method of pulsed NMR in which the transmitter pulses excite the specimen by simultaneously producing a whole band of frequencies, covering the entire spectrum of possible frequencies. As the specimen responds to the various frequencies, a mathematical technique called Fourier transformation is used to translate the responses. It is universally felt that the Fourier transformation method greatly increased the capabilities of NMR technology and the sensitivities of NMR apparatus.

The patent at issue in this case involves a technology called quadrature phase detection ("QPD"). Initially, this means that the apparatus uses phase-sensitive detectors; that is, the transient signals received by the probe are combined with a reference signal in the receiver. In QPD, there are two phase-sensitive detectors, and the transient radio-frequency response splits into two parts. Each signal enters a "phase" and the resulting two signals are 90 degrees out of phase with each other (that is, they are in "relative phase quadrature"). The result, then, is two audio-frequency signals that come out correspondingly different, by an order of 90 degrees. The phase detectors differ only in the fact that their reference analyses are in relative phase quadrature with each other. QPD also expanded the capabilities of NMR machines.

In order to maximize results in NMR experiments, two further procedures need to be done.

The first involves strengthening the signal. When the transient signal is first received, it is very weak—that is, there is interference from random sources of noise and static—and therefore the signal is difficult to detect. However, if the experiment is done again and again, and if each time the signal is the same, the signal will continue to grow and become more audible. Also, when an experiment is done ten times, the signal grows by a factor of ten, but the unwanted noise grows only by a factor of three. Thus, when the experiment is repeated over and over again, and the results are added in the data storage, the signal to noise ratio improves, and the signal becomes much easier to detect. Typically, an experiment is repeated hundreds, thousands, or even a million times. This repeating of the experiment is termed "time averaging".

Also performed on the detected signals is a mathematical manipulation called "data routing". Data routing manipulates the resulting transient signals.

Despite the advances made by QPD, the technology originally had some problems. In order to be successful, a quadrature phase detector had to be perfectly balanced. That is, the machine had to be constructed properly so that the reference signals would be precisely 90 degrees out of phase. Slight deviations from these specifications could create problems in detection. If these problems were present—if, for example, the reference signals are not precisely 90 degrees out of phase—the removal of the unwanted frequencies is no longer perfect. Rather, each observed frequency is accompanied by a "ghost" frequency. The observing scientist cannot tell which frequency is real and which is a ghost. Sophisticated scientists, generally not involved in routine commercial NMR work, were able to solve the ghost problem by various mathematical manipulations.

### B. The Hoult Patent

In the late 1960s and early 1970s, David Ian Hoult was completing his Ph.D at Oxford, under the supervision of Dr. (Sir) Rex Richards. During the course of his experiments, Dr. Hoult arrived at a means to solve the problems of "ghosts" without resorting to sophisticated manipulations of data. His "invention" is embodied in the claims and specifications of his 1975 patent.

This is where plaintiff NRDC arrives on the scene. The National Research Development Corporation, at that time an agent of the British government, identifies particular inventions made in university and government laboratories, and assists in the research, development and commercialization of the invention. It also undertakes responsibility for patenting the invention and issuing licenses for its use. NRDC then shares the revenue it makes with the inventor.[1] A patent application embodying the Hoult invention was filed in the United Kingdom on April 8, 1974 and in the United States on February 27, 1975. The United States pat-

ent was issued on December 21, 1976 and will expire on December 21 of this year. NRDC owns the rights to the Hoult patent.

In his patent specification, Dr. Hoult describes NMR spectrometers and their components, and notes problems with the early machines as they then existed. Specifically, he wrote that "it is impossible to determine from that signal to which side of the spectrum the transmitter frequency lies, and conversely, there is a 'mirror' effect in which noise and extraneous signals are 'reflected back' from the 'other' side of the transmitter frequency on to the spectrum of interest thus degrading the ultimate results." Dr. Hoult then described the benefits of quadrature NMR, but noted his belief that certain impediments inhibited scientists from taking advantage of the benefits of QPD in NMR spectrometers. As he put it:

> The carrying out of quadrature N.M.R. experiments of this kind has previously involved ensuring that the two audio-frequency channels of a spectrometer are matched to a very high degree of accuracy both in phase and in gain and that the two phase sensitive detections are accurately in quadrature. If these conditions are not met, the spectra obtained become extremely distorted and it is this problem which has hitherto prevented the wide use of quadrature N.M.R. despite its considerable advantages over single-phase N.M.R.

Dr. Hoult then specified that his patent was intended to be a solution to this problem. He wrote in summary:

> Thus by shifting the phase of the transmitter 90 [degrees] between pulses and performing simple addition and subtraction on the resultant detected signals it has proved possible to eliminate difficulties caused by the channels being phased incorrectly and having different gains.

The Hoult patent then discloses four claims. Claim 1 describes a nuclear magnetic resonance apparatus comprising (a) a pulse modulated radio-frequency transmitter means for exciting a specimen by means of a train of radio-frequency pulses, successive

---

1. Several years ago, the British government privatized NRDC, and the organization is now called the British Technology Group Limited.

ones of which are in relative phase quadrature, and (b) a receiver means for producing two audio frequency signals in response to the detection of transient radio-frequency resonance signals from the specimen so excited. The receiver means is also described as comprising quadrature phase detectors having as inputs (1) signals derived from and having the same transient form as the resonance signals, and (2) resonance signals which are in phase quadrature.

Claim 2 is dependent on Claim 1, and specifies that the transmitter means includes means for causing alternate pulses to be in phase opposition.

Claims 3 and 4 are method claims, which describe steps to be carried out when using the apparatus described in the first two claims. Claim 3 is the counterpart of claim 1 and claim 4 is the counterpart of claim 2.

The Hoult patent disclosed a specific combination of steps that, when used with practices common in the art, would eliminate the ghost problem. It worked in the following way: By shifting the phase of the transmitter, successive errors that occur in the output cancel each other out. The phase-shifting is accompanied by data routing of the detected signals, that is, directing the data to be stored in particular areas of memory. This is necessary to ensure that the data still accumulates in the proper way. The data routing also results in a reduction of systematic noise. Data routing is not included in the claims. Without data routing, the Hoult invention would be unable to accomplish its stated and clear purpose. The patent specification, however, makes clear that the Hoult patent is to be used with data routing, and a practitioner skilled in the art would recognize that the invention had to be combined with data routing to achieve its intended effect.

### C. The Prosecution History of the Hoult Patent

Dr. Hoult's patent application originally disclosed two claims, one of which contained a clause describing data routing, "whereby spectra representative of said specimen may be derived by processes including vectorial summation related to those of said receiver output signals corresponding to pairs of said successive pulses." The data routing portion of the claim was rejected for failure to adequately state. The other claims were rejected for obviousness because of two prior art references.

NRDC responded to the patent examiner's action by amending the claims to consist of the four claims. These claims were substantially identical to the claims embodied in the Hoult patent. The clause describing data routing was specifically deleted. NRDC also distinguished the prior art references by arguing that the references related to continuous wave systems with single phase detectors. NRDC did not bring to the examiner's attention any references encompassing pulsed systems with quadrature detectors. With NRDC's new submissions, the patent was approved.

In 1989, NRDC began this litigation against Varian, for infringement of the Hoult patent. While this litigation was progressing, Varian filed a Request for Reexamination of the Hoult Patent with the Patent and Trademark Office ("PTO"). On December 5, 1990, the PTO granted Varian's request, and on March 12, 1991 NRDC submitted a Patent Owner's Statement in response, submitting various documents cited by Varian in its request for re-examination. On May 13, 1991, Varian submitted its reply to NRDC's submissions, arguing that the Hoult patent was anticipated by prior art references and was obvious in light of the prior art. Ultimately, after an initial rejection of the patent and a request for reconsideration by NRDC, the patent was re-confirmed.

### D. The Prior Art

#### 1. Ellett

In 1971, an article by J.D. Ellett, et. al., called "Spectrometers for Multiple–Phase NMR". in ("Ellett") appeared in 5 Advances Magn.Reson. 117 (J.S. Waugh, ed. (1971)). Plaintiff's expert, John S. Waugh, designed the apparatus described in Ellett, supervised the project during which the apparatus was built, and was the principle author of the publication. The apparatus described consists of two NMR spectrometers, Spectrometer A and Spectrometer B. Spectrometer B is the instrument that is pertinent to this case.

Spectrometer B includes a pulse modulated transmitter, controlled by a pulse programmer, which in turn enables the programmer to execute an arbitrary pulse sequence. The Ellett transmitter was not intended to address the problem of ghosts, but it did have the capability to transmit pulses in relative phase quadrature. In fact, in one particular experiment, pulses were transmitted in the phase sequence 0, 180, 90, 270. Ellett's machine was capable of being programmed to generate a sequence of pulses in relative phase quadrature.

The Ellett experiment generally worked by transmitting "bursts" of pulses. That is, a thousand or so pulses would be generated in one burst, and then the experiment would be performed again. Thus, the first burst could consist of a series of pulses in phase quadrature, and then, after an interval of time to detect a transient, the experimenter would send another burst. The bursts would not be in phase quadrature with each other. The capabilities of the machine were such, though, that it could be programmed to transmit a series of successive pulses in phase quadrature, in the time intervals required to eliminate ghosts. However, the Ellett experiment was not designed in any way to address the problem sought to be solved by the Hoult invention. In other words, it would have required a special sophistication to look at Ellett and recognize that it could be programmed to transmit pulses in relative phase quadrature and could be used, by combining it with other technology, to solve the ghost problems.

Nonetheless, the receiver used in Ellett disclosed all the elements of the receiver described in the Hoult patent. Moreover, Ellett had two detectors operable in quadrature phase, and in one particular experiment, diagrammed in the article, both detectors were turned on.

When Dr. Hoult initially submitted his patent application, the patent examiner did not consider Ellett. However, when Varian requested re-examination of the Hoult patent in 1991, the examiner did consider Ellett. The examiner misunderstood Ellett, finding that the apparatus of a quadrature phase detector was not present. In fact, the Ellett experiment did contain a quadrature phase.

However, this misunderstanding was not relevant to the examiner's determination that:

Ellett detects transient radio-frequency resonance signals produced by cyclically repeating pulses that have exactly the *same phase*. The Hoult claims are clearly directed to transients excited by trains of pulses in which successive ones are in *relative phase quadrature*.

*Defendant's Trial Exhibit 67* at 5 (emphasis in original). Still, though, NRDC did not advise the examiner of his misunderstanding.

### 2. The Work at Monsanto

In the early 1970s, Dr. Edward O. Stejskal and Dr. Jacob Schaefer were scientists at the Monsanto Company. They worked in the Corporate Research Department in a group called "New Analytical Techniques." The group did not manufacture products for sale, but, instead, worked to develop technology to see if the technology would work, and then passed the technology on to other groups. Products they worked on would, at times, be commercialized.

In April 1973, Dr. Stejskal attended the Experimental Nuclear Magnetic Resonance Conference in Boulder, Colorado, a meeting of the NMR community. Dr. Richards, who was advising Dr. Hoult in his Ph.D endeavors, was also present. During one meeting among about 200 attendees, Dr. Richards showed a slide that had a diagram of his spectrometer, which included a quadrature detector. The slide showed the spectrometer being worked on by Drs. Hoult and Richards at Oxford, and showed the pulse transmitters and the quadrature phase detectors. Although the slide was shown quickly, and it was difficult to see details, Dr. Richards made no efforts at secrecy, and the slide was clear enough to stir further interest in at least one of the participants.

The next morning, while taking a shuttle bus from the scientists' hotel to the lecture room, Dr. Stejskal mentioned to Dr. Richards that he and Dr. Schaefer were planning to implement a quadrature detector similar to the one shown on the slide. The question was directly prompted by the showing of the slide. In the course of this private, informal conversation, Dr. Richards told Dr. Stejskal that cycling the phase of transmitted pulses in 90 degree increments, combined with data

routing, would remove any ghosts. Dr. Richards did not ask Dr. Stejskal to keep this information confidential, and did not inform him that either he or Dr. Hoult intended to file for a patent. Indeed, Dr. Hoult's name never came up.

After this meeting, Dr. Stejskal and Dr. Schaefer added quadrature detection to the receiver of their NMR spectrometer and modified the transmitter to transmit pulses in successive phases of 90 degrees. Their spectrometer imposed pulses of 0, 90, 0, 90. This work was completed by July or August of 1973. Thus, by the summer of 1973, more than one year before the application for Hoult patent was filed in the United States, the Monsanto scientists' spectrometer included a "transmitter means" that transmitted successive pulses in phase quadrature and included mechanical data routing, which was automated by July or August 1973. The technology used by the Monsanto scientists was precisely what is covered by the Hoult patent.

The Monsanto scientists used the spectrometer in the fall of 1973 and into 1974. They used the quadrature to determine whether the herbicide "Roundup" was safe for release in the environment, and they measured chemicals in a soybean growth enhancer. Both Roundup and the soybean growth enhancer were in the development stages when Drs. Schaefer and Stejskal worked on them. Ultimately, Roundup became one of Monsanto's most successful products.

The spectrometer was housed in the scientists' laboratory at this time, and a number of people, both from inside and outside Monsanto saw the machine. Employees from Monsanto visited the laboratory primarily for the purpose of seeing what results the scientists were getting, and not because of interest in the spectrometer. Monsanto employees were under restrictions to keep confidential anything they learned about Roundup.

. Of the other people who visited the laboratory, Jack Kisslinger from the Nicolet company had designed the scientists' computer, and visited in August 1973 to repair a short in the computer. Dr. James Cooper, also from Nicolet, had helped write the software package that enabled the scientists to convert the manual data routing function to an automated version. Nicolet salesman Penrod also visited the lab in July 1973. Also visiting were salesmen from an NMR manufacturer called Bruker, a Professor Varmer from Washington University, and a Professor Wolfman from the University of Missouri. While there is no evidence that Drs. Schaefer or Dr. Stejskal explained the spectrometer, or that any of the visitors understood the spectrometer, or, for that matter, that any of them understood the Hoult invention, the doctors were very open about the spectrometer. This is perhaps because they were "close-mouthed" only about technology they planned to commercialize, and, they did not plan to commercialize and sell the spectrometers.

Neither Dr. Stejskal nor Dr. Schaefer felt any obligation to report their use of the spectrometer to Dr. Richards or Dr. Hoult.

In October 1973, the two scientists began work on an article, intended in part to disclose and describe the NMR work they were doing. After they concluded the article in November, they submitted it to the Journal of Magnetic Resonance. As part of their—and other scientists'—usual practice, they sent preprints to a number of members of the NMR community. Their purpose in distributing the preprints was to inform others of their work as well as to solicit helpful comments that could be incorporated into the final draft of their soon-to-be published article. Because their spectrometer had originated with a suggestion from Dr. Richards to Dr. Stejskal, the two sent a preprint to Dr. Richards as a matter of courtesy. Dr. Richards wrote back, informing them that Dr. Hoult was actually the one who came up with the idea. In the published version of the article, both Dr. Richards and Dr. Hoult were credited with the idea.[2]

**2.** Evidence at trial spoke to a number of other disputed facts, including: (1) whether the patent was obvious in the art; (2) whether the patent discloses the best mode; (3) whether NRDC's conduct in obtaining the patent was inequitable; (4) whether Varian infringed the Hoult patent. Because of the nature of my findings of fact and conclusions of law, I need not address these issues.

## II. Conclusions of Law

This court has jurisdiction over this matter pursuant to 28 U.S.C. 1338(a). Varian has consented to personal jurisdiction for the purposes of this suit.

While it is NRDC that is suing for patent infringement, Varian presents a defense that challenges the validity of the Hoult patent. Since, if the Hoult patent is invalid or unenforceable, plaintiff cannot in any way win on its infringement claim, I will first address the issue of validity. Specifically, I address two of Varian's defenses which I consider most important in this case—first, whether the patent is anticipated by the Ellett reference, and, second, whether the patent is statutorily barred by a prior public use of the invention.

### A. Validity of Hoult Patent

The patent statute provides that:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.

35 U.S.C. § 282. Further, the statute squarely places the burden of proving facts establishing invalidity on the party who asserts invalidity. *Id.; Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). Such facts must be proven by clear and convincing evidence, and the ultimate determination is a conclusion of law based on those clearly and convincingly proven facts.

Varian offers several reasons why the Hoult patent is invalid. First, it contends that the Ellett reference anticipates each claim of the Hoult patent, and thus, the patent is invalid because it is not novel. Second, it contends that the work performed by the Monsanto scientists placed the patent in public use prior to one year before the filing date, and therefore the patent is statutorily invalid pursuant to 35 U.S.C. § 102(b). Third, it contends that the invention was obvious to a person with ordinary skill in the art of manufacturing NMR spectrometers. Fourth, it argues that the patent is invalid because it does not disclose the "best mode" for performing the patent. Finally, it argues

that NRDC is barred from enforcing the patent because of its inequitable conduct during the prosecution proceedings, particularly because it withheld information from the patent examiner.

I need not address all of these defenses.

### 1. Novelty: The Ellett Reference

■ Section 102 of 35 U.S.C. states that in order for a patent to be valid, the invention must be "novel", that is, it must not be anticipated by a prior art reference. The test for anticipation, though, is a very strict one. "A claim is anticipated only if each and every element *as set forth in the claim* is found, either expressly or inherently described, in a single prior art reference." *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1570 (Fed.Cir.1988) (citing *Kalman v. Kimberly–Clark Corp.,* 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984)).

■ While the patent consists of claims plus specifications, "[i]t is the claims that define the claimed invention." *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1053 (Fed.Cir.1988). Thus it is the claims, not specifications, that are anticipated. *Constant* at 1571. But claims do not always speak for themselves; to the contrary, they require interpretation. Thus, the Federal Circuit has repeatedly held that "claims are interpreted in the light of the specification." *Constant* at 1571 (citing *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir. 1985)). But while the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims. *SRI International v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985) (en banc). If the patent-owner seeks to have a limitation from the specification read into the claims, a reading of the specification must provide evidence "to indicate that [the] limitations must be interpreted into the claims to give meaning to disputed terms." *Constant* at 1571. *See also Corning Glass Works v. Sumitomo Electric U.S.A.,* 868 F.2d 1251, 1257 (Fed.Cir.1989) ("a court may not redraft a claim for pur-

poses of avoiding a defense of anticipation" and "extraneous limitations from the specification ... [should not] be read into the claim wholly apart from any need to interpret what the patentee meant by a word or phrase in the claim").

These principles, though, must be read in conjunction with parallel principles in favor of validity. For instance, "[a]mbiguous claims, whenever possible, should be construed so as to preserve their validity." *Texas Instruments Inc. v. U.S. Int'l Trade Commission,* 871 F.2d 1054, 1065 (Fed.Cir.1989); *see also Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 749 (Fed.Cir.1989) ("in determining validity, a claim must be construed to uphold its validity if possible"). In *Barient,* the Federal Circuit reversed the district court for failing to refer to the patent's specification and the prosecution history. However, the court noted, "[t]his rule of construction ... does not justify reading into a claim a limitation that it does not contain and that the patentee deleted from the claim during prosecution."

Because of the general policy in favor of validity, the need for interpretation of claims, and restrictive standard for anticipation, a prior publication must meet certain criteria. As the Third Circuit has stated in an oft-quoted passage, "[f]or a prior publication to be sufficient to defeat a patent, it must exhibit substantial representation of the invention in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or his own inventive skills." *Philips Electrical & Pharmaceutical Indus. Corp. v. Thermal & Elecs. Indus., Inc.,* 450 F.2d 1164, 1169 (3d Cir. 1971).

As noted above, the Hoult claim discloses an apparatus and means to excite a specimen by a train of radio-frequency pulses, successive ones of which are in phase quadrature. Hoult's claim and specification embody a phase sequence of 0, 90, 180, 270. In the particular Ellett experiment relied on by Varian, successive pulses were generated at phases of 0, 180, 90, 270, which NRDC's expert stated was nonetheless covered by the Hoult claim. In other words, if the Hoult claim is read to define simply an apparatus to generate successive pulses in phase quadra-

ture, the Ellett reference does just that. Yet Dr. Waugh testified that the Ellett experiment and the Hoult claim are so different in nearly every respect that he was "flabbergasted" that Varian could be claiming the Hoult claim reads on the Ellett experiment.

In fact, the evidence adduced at trial reveals that although the Hoult claim could have been drafted more carefully, the Ellett reference does not anticipate it. It is a close question, though, made even closer by counsel for Varian's thorough and incisive cross-examination of plaintiff's expert, Professor Waugh.

First, upon re-examination, the patent examiner held that Ellett does not anticipate Hoult because

Ellett detects transient radio-frequency resonance signals produced by cyclically repeating pulses that have exactly the *same phase.* The Hoult claims are clearly directed to transients excited by trains of pulses in which successive ones are in *relative phase quadrature.*

Varian is correct that the patent examiner misunderstood some parts of Ellett. However, that misunderstanding is not relevant to the finding quoted above, and I must accord weight to the patent examiner's finding. While it is true that Ellett may have been programmable and perhaps had the capabilities to excite transients by trains of pulses in which successive ones are in relative phase quadrature, there is no evidence that one skilled in the art would have known to make the requisite combinations of technology.

Second, when the Hoult claims are read as a whole and when they are informed by the specification, it appears that the invention requires the use of particular time intervals between pulses. The times at issue in the Ellett experiment were much different. Nonetheless, the following colloquy occurred at trial, between Varian's attorney and NRDC's expert:

Q: The claim—never mind for the moment the specification, the data routing and all the rest of it, the claim talks about a train of radio-frequency pulses, successive ones of which are in relative phase quadrature. And you told me that that claim language covers a sequence of zero,

Q: 90, 180, 270, it also covers a sequence of zero, 180, 90, 270.

A: Yeah.

Q: Your WAHUHA sequence is a sequence of zero, 180, 90, 270.

A: Um-hum.

Q: So that if we are unable to find some sort of critical distinction such as this timing the claim reads it right on the WAHUHA sequence, doesn't it?

A: If you can't find anything, yes, it might. . . .

Q: [I]f one can't find some other limit phase to apply here from the patent, then the Hoult patent is invalid because of the Ellett reference, correct?

A: Yeah. . . .

Transcript at 220–21. However, this only leads the fact-finder to the question of whether the claim language "a train of pulses" can be informed by the specification. I believe that in light of the presumption of patent validity, and the fact that the claim language is ambiguous because of its lack of specificity, the fact-finder should look at the specification. A reading of the goals as contained in the specification informs the language. That is, when the language of the claim is read to solve the problem of the ghosts, it becomes clear that the specification must be used to determine the meaning of "a train of pulses." This being the case, it appears from the testimony of Dr. Waugh that an ordinary practitioner in the art would read the claim language "a train of pulses" to mean that in the Hoult invention, a specimen is excited again and again. Each time a specimen is excited, enough time is waited to detect a transient, and then the phase is shifted.[3] Varian has not proven that the prior publication sufficiently disclosed the Ellett invention that a reader of the article could have arrived at the Hoult invention.

Third, the Hoult claim covers an apparatus and means for exciting a specimen by means of a train of pulses, successive ones which are in phase quadrature. For instance, Varian was able to get Dr. Waugh to concede that if the claim is read quite narrowly, it may read on the Ellett experiment. This is because the Ellett experiment involves successive bursts of pulses, each burst consisting of an alternating series pulses, in phase quadrature with each other. Thus, a burst may consist of a thousand repetitions of 0, 180, 90, 270. Although the Ellett experiment worked by repeating each burst without changing the phase, the testimony reflected that the spectrometer could be programmed after each burst to ensure that successive bursts are in phase quadrature. However, this way of interpreting Ellett is over-sophisticated, outside the goals of Ellett, and would require the user's own inventive skills.

Thus, I find that the Ellett reference does not anticipate the Hoult patent.

### 2. Public Use—The Statutory Bar

■ Next, Varian contends that the Hoult patent was in public use more than one year prior to the filing date of the patent, and that therefore the patent was invalid.

The patent statute provides that a person is entitled to a patent unless "[t]he invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102.

It does not take much to trigger the "public use" statutory bar to a patent, see 2 Chisum, *Patents,* § 6.02[5] at 6–36 (1993). In *Egbert v. Lippmann,* 104 U.S. 333 (14 Otto 1881), 26 L.Ed. 755, Justice Woods wrote that "to constitute the public use of an invention it is not necessary that more than one of the patented articles should be publicly used." *Id.* 104 U.S. at 336. Rather, "one well-defined case of such use is just as effectual to annul the patent as many." *Id.* (citing *McClurg v. Kingsland,* 42 U.S. (1 How.) 202, 11 L.Ed. 102).[4] Further:

---

**3.** Dr. Waugh acknowledged that "Hoult does not anywhere specifically say a second. Does not say you must wait a second between applications." Transcript at 228. However, Dr. Waugh went on to point out that a NMR user versed in the art would have recognized the timing necessary to perform Dr. Hoult's invention. Transcript at 230.

**4.** The fact that in *Egbert* the invention was used for eleven years before the patent application was filed was irrelevant to the Supreme Court's actual holding.

If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person.

*Id.* 104 U.S. at 336. Elaborating on this doctrine, the Court stated that "[a] mere experimental use is not the public use defined by the Act, but a single use for profit, not purposely hidden, is such." *Electric Battery Company v. Shimadzu,* 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071 (1939). Thus, "[t]he ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use." *Id.* at 20, 59 S.Ct. at 684.[5] In short, then, the fact that the use occurs in an area from which the public is generally excluded is irrelevant to the doctrine. As one court put it in another context:

Samples of a device freely shown and delivered to persons who are actively interested in the construction have been held to constitute public knowledge.... A prior use is sufficient to anticipate a patent if it involves work done openly and in the ordinary course of business activities without any deliberate attempt at concealment or effort to exclude the public, even though no deliberate act was taken to bring the work to the attention of the public at large ... and even though the invention may be of a nature that it cannot be seen or observed by the public eye.

*State Industries Inc. v. Rheem Manufacturing Co.,* 223 USPQ 305, 316–17, 1984 WL 1243 (M.D.Tenn.1984), *aff'd in part & rev'd in part,* 769 F.2d 762 (Fed.Cir.1985).

There is no question that, at least initially, Varian has demonstrated facts by clear and convincing evidence that the Hoult invention was in public use. In April 1973, Dr. Stejskal and Dr. Rex Richards, Dr. Hoult's research advisor, attended a meeting of the NMR community in Boulder, Colorado. On a bus ride during the conference, Dr. Richards informed Dr. Stejskal about the Hoult invention.

After returning to Monsanto, Drs. Stejskal, with his colleague Dr. Schaefer, implemented Dr. Richards' idea, and wound up by July or August 1973 with a spectrometer containing the Hoult patent. Both Dr. Schaefer and Dr. Stejskal testified that anyone from Monsanto was allowed to enter their laboratory, and that several people from outside Monsanto also entered the laboratory and viewed the machine. The two scientists were very open about the spectrometer. Their NMR spectrometer that utilized the Hoult invention was used in their analysis of a soybean growth enhancer and a herbicide called "Roundup."

NRDC offers several reasons why the Monsanto work was not a public use. I will address these in turn.

First, NRDC contends the Monsanto scientists were restricted or limited in their use by the inventor. Specifically, they state that there is an understanding among scientists in the academic and research community that private conversations are not for publication. In fact, Dr. Stejskal testified that his conversation with Dr. Richards "was private in that only the two of us could hear the conversation, in the sense of a private communication such that there was no publication of it, that any reference that I would make to someone else I would only be able to refer to the conversation." *Stejskal Deposition* at 74. But in a later colloquy, Dr. Stejskal elaborated on his definition of the word private: "[I]t's not the same as 'secret.' It just means two people or a very small number of people speaking together. That may be a misunderstanding of your question, but I—'private' to me means not published in the academic world." Stejskal at 74–75. "Not published in the academic world," without more, simply does not reflect an agreement that the work was confidential or secret.

NRDC further points to a cover page of a paper given by Dr. Schaefer in Canada concerning his and Dr. Stejskal's work using the Hoult invention. The page stated:

Information contained herein is solely for the use of the reader. Quotation or cita-

---

5. Despite the language about use for profit, though, one leading commentator has pointed out that "there is no indication that the court

thought that profit was essential." Chisum at 6–36 (citing cases).

tion is NOT permitted, except by direct arrangement with the author, and with such permission the material quoted *must* be referred to as a 'Personal Communication.'

*Schaefer Deposition* at 78. However, Dr. Schaefer interpreted this language as allowing participants at a conference to present results which "are perhaps incomplete, possibly even wrong, in order to stimulate discussion and exchange of ideas." *Schaefer Deposition* at 79. In other words, the cover page qualification is to ensure that the scientist has the opportunity to revise his or her work with input from scientists, and that he or she will not be publicly held to a preliminary analysis. It is unclear how NRDC is tying this policy to the statutory public use bar. *See, e.g., Schaefer Deposition* at 84–85, in which he discusses the understanding within the scientific community that "materials received as preprints are treated as private communications and you never cite them without first obtaining permission." This is obviously describing the scientific community's etiquette regarding unfinished and possibly erroneous drafts of *articles* to be published. It is not relevant to whether a particular invention has been in public use.[6]

Despite the fact that NRDC's argument pertains to publications rather than public use, at any rate, the facts in this case belie NRDC's interpretation. First, both Dr. Schaefer and Dr. Stejskal testified that they had no idea who Dr. Hoult was until Dr. Richards informed them after he was given a preprint of the two scientists' article. Second, the undisputed testimony shows that Dr. Richards did not ask Dr. Stejskal to keep the invention confidential or secret. Third, Dr. Richards did not inform Dr. Stejskal that he or anyone else intended to apply for a patent on the device. Fourth, Dr. Schaefer sent Dr. Richards a preprint of their article detailing the Hoult invention, as a matter of "courtesy" and not because of any recognized obli-

gation on their part. Fifth, the way in which Dr. Richards presented the slide of the spectrometer and communicated to Dr. Stejskal present no evidence of confidentiality. The facts simply do not support NRDC's assertion that "Drs. Stejskal and Schaefer were under an obligation not to publish the idea." NRDC's Proposed Finding of Fact 58.[7]

Next, NRDC argues that the Monsanto scientists' use of the spectrometer cannot be deemed public use because they used it only for confidential research at Monsanto and not to produce any commercial product or to make any measurement on a then-commercial product. The facts do not support this assertion. First, the record reveals that the Monsanto scientists made no effort at concealment. In fact, while the scientists would restrict their discussions with outside visitors to NMR technology in which Monsanto had no interest in commercial development, Drs. Schaefer and Stejskal were very open about the particular hardware at issue in this case.

In fact, a number of people viewed the technology in the machine:

—On July 25, a salesman from a company called Nicolet visited the lab and saw the machine;

—On August 8, a Nicolet engineer named Dr. Kisslinger, who designed the Nicolet computer which Monsanto used for implementing quadrature, visited. Dr. Kisslinger visited to fix a malfunction in the machine.

—Professor Varmer of Washington University visited the laboratory on November 6, 1974.

NRDC correctly points out that Varian has adduced no testimony from any of these individuals that Drs. Stejskal or Dr. Schaefer demonstrated or described the NMR machine to them. Indeed, there is no testimony that any of these individuals understood the Hoult invention in the context of the patent. However, NRDC's facts are irrelevant, for, if

---

6. See also *Schaefer Deposition* at 92, in which he discusses his policy on providing reprints to members of the NMR community:

> As I say, I didn't have a systematic way of doing this. I looked at people who I thought would give me a response. This is in part because I was interested, as I say, in informal review prior to—which is in addition to the formal review process. And so I would make

those—I'd make copies to people I thought were interested enough to read the preprints and to respond to the contents.

7. At times, NRDC appears to confuse Monsanto's secrecy concern regarding a product it was developing with its alleged concern with the secrecy of the spectrometer.

**1132**

the invention is used in its natural or intended way, *see FMC Corp. v. F.E. Myers & Bros. Co.*, 384 F.2d 4, 9 (6th Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), it does not matter if the invention is free from detection. Thus, in *Egbert, supra*, it was irrelevant to the Supreme Court that the corset steels at issue were hidden from public view. And in *Hall v. Macneale*, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1883), an invention that was embodied inside a safe was still held to be in public use, even though the safe would have had to be destroyed in order to bring the invention into view.[8] *See also Rheem Manufacturing, supra* at 317 (to constitute public use, the invention "may be of such a nature that it cannot be seen or observed by the public eye").[9]

Thus, the question is simply whether the *Monsanto* scientists were using the spectrometer in the usual course of their business.

NRDC argues that since the Monsanto's scientists were not producing products directly, they were not using the spectrometer in the usual course of Monsanto's business.

8. NRDC distinguishes *Hall* by pointing out that in that case, the patentee sold the safes to the public and that, therefore, the safes were in public use. While this argument is relevant to NRDC's claim that there was no public use, it does not combat the principle that it is irrelevant whether or not the members of the public actually see or comprehend the use of the invention.

9. NRDC cites one case that seems to support its proposition. In that case, the Federal Circuit, in reversing a district court's finding of public use, pointed out that:

There is no evidence that a viewer of the machine could thereby learn anything of which process, among all processes, the machine is being used to practice.... [L]ooking at the machine in operation does not reveal whether it is stretching, and if so, at what speed.... There is no evidence that Budd's secret use of the ... machine made knowledge of the claimed process accessible to the public.

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549 (Fed.Cir.1983). In that case, though, the alleged prior public user was under a written secrecy agreement not to disclose the apparatus. Moreover, the employees of the prior user were required to sign confidentiality agreements to keep the technology secret. The Federal Circuit, then, was concerned only with whether this *secret* use nonetheless became public by the prior user's actions.

I disagree. NRDC's argument, if adopted, would essentially mean that any use of technology by Dr. Stejskal or Dr. Schaefer—or other research scientists like them—were immune from the public use statutory bar simply because of the nature of their particular place in Monsanto's process of production and commercialization. The Monsanto scientists worked in a particular research group, designed to develop technology which, when perfected, was passed on to other producing divisions. This appears to be an integral aspect of Monsanto's process for developing commercial-ready materials. There is no evidence that the two scientists were working to perfect the spectrometer. In fact, NRDC concedes as much by strenuously arguing that Monsanto's internal people visited the lab not because of the spectrometer but to see how the scientists were progressing in their results. Thus, the facts reveal that Drs. Stejskal and Schaefer used the "Hoult" spectrometer to analyze a soybean growth enhancer.[10] Moreover, they used their spectrometer to assess whether a particular Monsanto herbicide called "Roundup" was safe for release into the environment.[11] Eventu-

Moreover, NRDC's broader interpretation of *Garlock* would mean that the Federal Circuit was willing to dispense with prior established principles in a somewhat terse manner. I do not believe that this was the Federal Circuit's intent.

10. NRDC argues that the chemicals measured in the soy beans were in the development stage and measurements were not complete at that time. It further argues that measurements in a research laboratory on developmental products are not a commercial use. It appears to this court that the relevant question is whether the invention was used in the normal course of the company's business, without limitation or attempts to conceal. Whether the invention was sold, or used at the direct producing line is irrelevant.

11. NRDC argues that since Drs. Stejskal's and Schaefer's research group involved finding out "new things, as distinct from ... develop[ing] new products or improv[ing] existing products", their use cannot be termed "public use." Unless NRDC's position is that an instrument used in the course of research, as opposed to performing routine commercial measurements, is never public, I am not sure I understand the argument. At any rate, Dr. Stejskal testified that his group performed both pure and applied research. *Stejskal Deposition* at 66.

ally, Roundup became one of Monsanto's most successful products.

Therefore, the evidence clearly and convincingly demonstrates that Dr. Stejskal and Dr. Schaefer used their phase-shifting spectrometer in the ordinary course of Monsanto's business. As another court has put it, in a case involving similar circumstances in which plaintiff had argued that the prior use was not accessible to the public:

> It is irrelevant whether the use informed the public. Neither [use] was kept secret, for, as the district court found, these operations were carried on openly by ordinary factory help, with no attempts made to hide the operations from their employees or visitors.... Since no evidence was adduced that Western Electric considered this work to be secret or confidential, it is immaterial that its employees and [defendant] had agreed not to disclose secret or confidential knowledge acquired....

*Magnetics, Inc. v. Arnold Engineering Company,* 438 F.2d 72, 74 (7th Cir.1971).

Next, NRDC argues that the public use doctrine should be analogized to the enabling standard used in determining whether a prior publication anticipates an invention. As NRDC correctly points out, a printed publication may not be held to anticipate an invention unless the publication is generally available to the relevant segment of the public, *see Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 936 (Fed.Cir.1990). In the printed publication context, information is considered publicly accessible if "interested members of the relevant public could obtain [it] if they wanted to...." *Constant, supra,* at 1569; *see also Aluminum Company of America v. Reynolds Metals Company,* 14 USPQ2d 1170, 1172, 1989 WL 165064 (N.D.Ill.1989) ("the touchstone of a printed publication is public accessibility") (citation omitted).

Applying NRDC's intriguing argument to the public use provisions of § 102(b), however, would eviscerate a century of case law interpreting the language "public use." As the Federal Circuit held in *Northern Telecom,* before a publication can even be considered a printed publication, it must meet certain "access" criteria. This is not the case in the public use context. As noted above, the public use doctrine requires an inquiry into whether the invention was used in its natural and intended way. Public use is about whether the invention was used. The prior publication standard is about whether a person using reasonable diligence would have discovered an enabling publication. A prior use is public even if there is no effort to show the invention to the public at large, *see FMC Corp. v. F.E. Meyers & Bros. Co.,* 384 F.2d 4, 9 (1968), even if the invention is completely hidden from view, *Koehring Co. v. National Automatic Tool Co.,* 362 F.2d 100, 104 (7th Cir.1966); even if viewers of a machine incorporating the invention do not comprehend the invention. There simply is no requirement that the prior user make an effort to make the invention publicly *accessible,* so long as he or she uses it in the ordinary course of business without efforts to conceal it.

Finally, NRDC points out that the caselaw involving prior public use generally involves inventions that were actual products and were used commercially by the prior public user. NRDC's point is well-taken but ultimately does not persuade. Although NRDC correctly points out distinctions in factual scenarios, those distinctions are not relevant to the legal propositions articulated by those cases. Moreover, NMR spectrometers are generally used not as commercial products *per se* but as tools for analyzing and assessing other commercial products. This is still a commercial, and—in this case—a non-experimental use, albeit the spectrometers themselves were not sold.

Thus, since there is no dispute that the Hoult patent reads on the spectrometer used by Drs. Schaefer and Stejskal, and since it was in public use in this country more than one year prior to the date Dr. Hoult filed for his American patent, I find that the patent is invalid.

## B. Other Issues

In light of this finding, I need not address any of the disputes in this case.

## CONCLUSION

For the reasons detailed above, NRDC's claims against Varian are denied. As noted

above, there is therefore no need to hold a trial on any other issues.