The **NATIONAL RESEARCH AND DEVELOPMENT CORPORATION,** et al., Plaintiffs,

v.

**VARIAN ASSOCIATES, INC., Defendant.**

Civ. A. No. 89–2459 (HAA).

United States District Court,
D. New Jersey.

May 4, 1995.

in a medical malpractice action. Therefore, its reasoning is not entirely applicable to the situation at bar.

John J. Francis, Jr., Shanley & Fisher, P.C., Morristown, NJ, John A. O'Brien, Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiffs.

Arnold B. Calmann, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, Albert E. Fey, Jesse J. Jenner, Fish & Neave, New York City, for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

In 1989, plaintiff, the National Research and Development Corporation ("NRDC" or "plaintiff")[1], brought this action for infringement of U.S. Patent No. 3,999,188 ("'118 patent" or "Hoult patent") against Varian Associates, Inc. ("Varian" or "defendant").

The Hoult patent discloses four claims. Claim 1 describes a nuclear magnetic resonance ("NMR") apparatus made up of speci-

1. NRDC was formerly an agent of the British government. Several years ago, the British government privatized NRDC, and the organization is now called the British Technology Group Limited.

fied components including, among other things, a radio-frequency transmitter means for exciting a specimen by means of a train of radio-frequency pulses, successive ones which are in relative phase quadrature (i.e., off by 90°).

Claim 2 is dependent on Claim 1, and specifies that the transmitter means includes means for causing alternate pulses to be in phase opposition (i.e., off by 180°).

Claim 3 and claim 4 are method claims, which describe steps to be carried out when using the apparatus described in the first two claims. Claim 3 is the counterpart to Claim 1 and Claim 4 is the counterpart to Claim 2. See generally National Research Development Corporation v. Varian Associates, 822 F.Supp. 1121, 1121–24 (D.N.J.1993) (discussing NMR spectrometry and the Hoult patent), aff'd in part, vacated in part, 17 F.3d 1444 (Fed.Cir.1994) (Table) (text in Westlaw at 1994 WL 18963).

The primary defense asserted by Varian in this suit is their contention that, for a number of reasons, NRDC's patent is invalid. All issues other than the validity and enforceability of the patent and Varian's alleged infringement were bifurcated and stayed for a later separate trial.

Between February 9, and 23, 1993, this court held a bench trial. After trial, this court held that all four claims of the Hoult patent were not anticipated under 35 U.S.C. § 102(a) but were nevertheless invalid under the public use bar of 35 U.S.C. § 102(b). See NRDC, 822 F.Supp. at 1127–32. Because the court found all four claims of the patent invalid under § 102(b), none of Varian's other defenses were addressed.

Plaintiff appealed this decision. The Federal Circuit upheld the determination that claims 1 and 3 were invalid under the public use bar of 35 U.S.C. § 102(b). See NRDC, 1994 WL 18963 at *3–*4. However, the Federal Circuit stated that it was undisputed that only the subject matter of claims 1 and 3 (and not claims 2 and 4) were incorporated

into the apparatus that made up the prior public use—a spectrometer used by scientists at the Monsanto Company. Id. at *4. The Federal Circuit noted "that public use activity invalidating some claims of a patent under section 102(b) creates prior art that may support an obviousness-type invalidation of other claims within the same patent under §§ 102(b), 103." Id. (citations omitted). Because none of the requisite factual findings which underlie an ultimate conclusion of obviousness were made by this court at trial, the Federal Circuit vacated this court's holding with respect claims 2 and 4 and remanded the matter for further proceedings. See id. at *4–*5.

On remand, Varian argues, among other things, that claims 2 and 4 of the Hoult patent are invalid for three reasons: 1) due to obviousness under 35 U.S.C. § 103; 2) due to inequitable conduct before the Patent Office by NRDC; and 3) for failure to meet certain requirements of 35 U.S.C. § 112. NRDC denies that claims 2 and 4 are invalid, and asserts that Varian infringed claims 2 and 4.

On March 31, 1995, this court heard oral argument concerning these issues. The following constitutes my findings of fact and conclusions of law. As is detailed below, I will deny the remainder of NRDC's claims against Varian because claims 2 and 4 of its patent are invalid pursuant to 35 U.S.C. § 103.

## I. Findings of Fact.[2]

### A. The Background.

The patent in this case involves the field of nuclear magnetic resonance spectroscopy ("NMR"). Spectroscopy is the study and analysis of materials to determine their components and molecular structure. NMR is a particular form of spectroscopy that works by observing a material's reaction to imposed radiation. NMR depends on the properties

---

2. The findings of fact are based on the evidence presented at the trial held between February 9 and 23, 1993. A significant portion of the findings were previously reported in the prior opinion in this case. See National Research Development Corporation v. Varian Associates, 822 F.Supp. 1121 (D.N.J.1993), aff'd in part, vacated in part, 17 F.3d 1444 (Fed.Cir.1994) (Table) (text in Westlaw at 1994 WL 18963).

of nuclear magnetism and operates on relatively low radio frequencies.

An NMR apparatus normally consists of a large magnet, a material to be analyzed, a radio-frequency pulse transmitter to excite a sample, and a radio-frequency receiver and detector, which will observe the response. In addition, a device such as a computer memory is attached to the detector to store the recorded data.

Modern spectroscopy uses a pulsed NMR method. Pursuant to this method, radiation is applied in short pulses rather than continuously, which was the prior method. As the nuclei in the sample being analyzed react, a transient, temporary radio-frequency response will follow. The transient is received by a probe. The probe is connected to a part of the receiver which is called the detector. The detector then produces a signal whose strength varies in precisely the same manner as the strength of the detected transient. Generally, the detected transient signals are printed or displayed as a spectrum of marks at frequencies characteristic of the material being analyzed.

In the mid–1960's, Varian scientist Weston A. Anderson discovered a technology called Fourier transform NMR. This is a method of pulsed NMR in which the transmitter pulses excite the specimen by simultaneously producing a whole band of frequencies, covering the entire spectrum of possible frequencies. As the specimen responds to the various frequencies, a mathematical technique called Fourier transformation is used to translate the responses. The Fourier transformation method greatly increased the capabilities of NMR technology and the sensitivities of NMR apparatus.

The patent at issue in this case involves a technology called quadrature phase detection ("QPD").

> Initially, this means that the apparatus uses phase-sensitive detectors; that is, the transient signals received by the probe are combined with a reference signal in the receiver. In QPD, there are two phase-sensitive detectors, and the transient radio-frequency response splits into two parts. Each signal enters a "phase" and the resulting two signals are 90 degrees out of phase with each other (that is, they are in "relative phase quadrature"). The result, then, is two audio-frequency signals that come out correspondingly different, by an order of 90 degrees. The phase detectors differ only in the fact that their reference analyses are in relative phase quadrature with each other. QPD also expanded the capabilities of NMR machines.

*NRDC*, 822 F.Supp. at 1122.

In order to maximize results in NMR experiments, two further procedures need to be done.

The first is termed "time averaging" and involves strengthening the signal. When the transient signal is first received, it is difficult to detect (i.e., is very weak) because there is interference from random sources of noise and static. However, if the experiment is done again and again, and if each time the signal is the same, the signal will continue to grow and become more audible. When an experiment is done ten times, the signal grows by a factor of ten, but the unwanted random noise grows only by a factor of three. Thus, when the experiment is repeated over and over again, and the results are added in the data storage, the signal to random noise ratio improves, and the signal becomes much easier to detect. Typically, an experiment is repeated hundreds, thousands, or even a million times.

The second procedure performed on the detected signals is a mathematical manipulation called "data routing". Data routing manipulates the resulting transient signals.

Despite the advances made by QPD, the technology originally had other problems. These problems included, as Dr. Hoult refers to them, "ghosts" and "systematic noise".

First, the problem of "ghosts".

In order to be successful, a quadrature phase detector had to be perfectly balanced. That is, the machine had to be constructed properly so that the reference signals would be precisely 90 degrees out of phase. Slight deviations from these specifications could create problems in detection. If these problems were present—

**980**

if, for example, the reference signals are not precisely 90 degrees out of phase—the removal of the unwanted frequencies is no longer perfect. Rather, each observed frequency is accompanied by a "ghost" frequency. The observing scientist cannot tell which frequency is real and which is a ghost. Sophisticated scientists, generally not involved in routine commercial NMR work, were able to solve the ghost problem by various mathematical manipulations.

*NRDC,* 822 F.Supp. at 1123.

The second problem is that of "systematic noise". Systematic noise results from the presence near the spectrometer of radio signals from sources other than the spectrometer. For example, if there is a radio transmitter near the laboratory transmitting a steady signal that happens to lie within the band of interest in the spectrometer and the laboratory is not adequately shielded to keep out the signal, then the outside radio signal will leak through the spectrometer and show up on the final spectrum.

### B. The Hoult Patent.[3]

As stated previously, the Hoult patent addresses these two problems. Claims 1 and 3 of the Hoult patent, which have been held invalid, deal with the problem of ghosts. Claims 2 and 4, which are dependent on claims 1 and 3 and are now at issue, deal with the problem of systematic noise.

In his patent specification, Dr. Hoult first described NMR spectrometers with single-phase detectors and their components, and noted problems with these machines as they then existed. Dr. Hoult then described the benefits of quadrature phase detection NMR relative to single-phase NMR. Thereafter, Dr. Hoult noted his belief that the problems with QPD which caused the appearance of a ghost frequency inhibited scientists from taking advantage of the benefits of QPD in NMR spectrometers. As he put it:

The carrying out of quadrature N.M.R. experiments of this kind has previously involved ensuring that the two audio-frequency channels of a spectrometer are

matched to a very high degree of accuracy both in phase and in gain and that the two phase sensitive detections are accurately in quadrature. If these conditions are not met, the spectra obtained become extremely distorted and it is this problem which has hitherto prevented the wide use of quadrature N.M.R. despite its considerable advantages over single-phase N.M.R.

Dr. Hoult then specified that his patent was intended to be a solution to this problem. In addition, Hoult stated that his patent was intended to be a solution to the problem of systematic noise.

He wrote in summary:

Thus by shifting the phase of the transmitter 90° between pulses and performing simple addition and subtraction on the resultant detected signals it has proved possible to eliminate difficulties caused by the channels being phased incorrectly and having different gains.

A further advantage of shifting the transmitter phase occurs when the transmitter signal is shifted through 180°. This inverts the output signals and by subtracting the inverted signals from the original signal the systematic noise can be eliminated whilst the signal is increased.

Thus by utilizing the transmitter circuit of FIG. 1 to change the transmitter phase cyclically by 0°, 90°, 180°, and 270° etc. on successive pulses, and by performing the appropriate additions and subtractions in a computer, quadrature N.M.R. becomes a very attractive proposition without the necessity for exceedingly accurate matching in the audio frequency channels and exceedingly accurate quadrature detection.

The Hoult patent then discloses four claims. Claim 1, which has been held invalid, describes a nuclear magnetic resonance apparatus comprising (a) a pulse modulated radio-frequency transmitter means for exciting a specimen by means of a train of radio-frequency pulses, successive ones of which are in relative phase quadrature, and (b) a receiver means for producing two audio fre-

**3.** The application for the Hoult patent was filed in the United Kingdom on April 8, 1974 and in the United States on February 27, 1975. The

United States patent was issued on December 21, 1976 and expired on December 21, 1993.

quency signals in response to the detection of transient radio-frequency resonance signals from the specimen so excited. The receiver means is also described as comprising quadrature phase detectors having as inputs (1) signals derived from and having the same transient form as the resonance signals, and (2) resonance signals which are in relative phase quadrature.

Claim 2, which is at issue, is dependent on Claim 1, and specifies that the transmitter means includes means for causing alternate pulses to be in phase opposition.

Claims 3 (which is invalid) and 4 (which is at issue) are method claims, which describe steps to be carried out when using the apparatus described in the first two claims. Claim 3 is the counterpart of claim 1 and claim 4 is the counterpart of claim 2.

In the previous opinion in this case, I found, referring to claims 1 and 3, that

[t]he Hoult patent disclosed a specific combination of steps that, when used with practices common in the art, would eliminate the ghost problem. It worked in the following way: By shifting the phase of the transmitter, successive errors that occur in the output cancel each other out. The phase-shifting is accompanied by data routing of the detected signals, that is, directing the data to be stored in particular areas of memory. This is necessary to ensure that the data still accumulates in the proper way.

NRDC, 822 F.Supp. at 1124. These findings are applicable to claims 2 and 4, because claims 2 and 4 are dependent upon, and thus subsume, claims 1 and 3, respectively.

Therefore, claims 2 and 4 disclosed a specific combination of steps that, when used with practices common in the art, would eliminate the problem of systematic noise. This was accomplished by shifting the phase of the transmitter in such a way as to cause alternate pulses to be in phase opposition. The phase-shifting is accompanied by data routing of the detected signals to ensure that the data accumulates in the proper way. The detected signals which are in phase opposition are subtracted from each other, thereby resulting in the cancellation of systematic noise while increasing the signal.

In the previous opinion, I further found that

[d]ata routing is not included in the claims. Without data routing, the Hoult invention would be unable to accomplish its stated and clear purpose. The patent specification, however, makes clear that the Hoult patent is to be used with data routing, and a practitioner skilled in the art would recognize that the invention had to be combined with data routing to achieve its intended effect.

NRDC, 822 F.Supp. at 1124. These findings are equally applicable to all four claims.

C. The Prior Art.

1. The Monsanto Spectrometer.

In remanding this case, the Federal Circuit stated "that public use activity invalidating some claims of a patent under section 102(b) creates prior art that may support an obviousness-type invalidation of other claims within the same patent under §§ 102(b), 103." NRDC, 1994 WL 18963 at *4 (citing In re Kaslow, 707 F.2d 1366, 1374 (Fed.Cir. 1983); In re Corcoran, 640 F.2d 1331, 1333–34 (CCPA 1981)). See also Keystone Retaining Wall Systems v. Westrock, Inc., 997 F.2d 1444, 1451–52 (Fed.Cir.1993) (" 'Section 102(b) may create a bar to patentability either alone, if the device placed on sale [or in public use] is an anticipation of the later claimed invention or, in conjunction with 35 U.S.C. § 103 (1988), if the claimed invention would have been obvious from the on-sale [or publicly-used] device in conjunction with the prior art.' " quoting LaBounty Mfg., Inc. v. U.S. International Trade Commission, 958 F.2d 1066, 1071 (Fed.Cir.1992)). The Federal Circuit also affirmed this court's holding pursuant to § 102(b) to the extent that I found claims 1 and 3 of the Hoult patent invalid due to prior public use by scientists at the Monsanto Company of a spectrometer incorporating the subject matter of these claims. Thus, the Monsanto spectrometer is prior art for the purposes of determining whether claims 2 and 4 are obvious under § 103.

The Monsanto spectrometer was created by Dr. Edward O. Stejskal and Dr. Jacob Schaefer. In April of 1973, Dr. Stejskal attended the Experimental Nuclear Magnetic Resonance Conference in Boulder, Colorado, a meeting of the NMR community. Dr. Richards, who was advising Dr. Hoult in his Ph.D. endeavors, was also present at the conference. During a conversation while at the conference, Dr. Richards disclosed Hoult's idea for eliminating ghosts. "Dr. Richards told Dr. Stejskal that cycling the phase of transmitted pulses in 90 degree increments, combined with data routing, would remove any ghosts." *NRDC*, 822 F.Supp. at 1125–26. After the conference, Dr. Stejskal and Dr. Schaefer incorporated this idea into their work at Monsanto. Specifically,

> Dr. Stejskal and Dr. Schaefer added quadrature detection to the receiver of their NMR spectrometer and modified the transmitter to transmit pulses in successive phases of 90 degrees. Their spectrometer imposed pulses of 0, 90, 0, 90. This work was completed by July or August of 1973. Thus, by the summer of 1973, more than one year before the application for the Hoult patent was filed in the United States, the Monsanto scientists' spectrometer included a "transmitter means" that transmitted successive pulses in phase quadrature and included mechanical data routing, which was automated by July or August 1973. The technology used by the Monsanto scientists was precisely what is covered by the Hoult patent.

*NRDC*, 822 F.Supp. at 1126. To be more accurate, the technology used by the Monsanto scientists was precisely what is covered by claims 1 and 3 of the Hoult patent. The Monsanto spectrometer, however, had not been modified to transmit alternate pulses in phase opposition and never was used to eliminate systematic noise. The Monsanto spectrometer was never programmed to transmit pulses in any sequence other than 0°, 90°, 0°, 90°.

### 2. Ellett.

In 1971, an article by J.D. Ellett, et. al., called "Spectrometers for Multiple–Phase NMR" in ("Ellett) appeared in 5 Advances Magn. Reson. 117 (J.S. Waugh, ed. (1971)). Plaintiff's expert, John S. Waugh, designed the apparatus described in Ellett, supervised the project during which the apparatus was built, and was the principle author of the publication. The apparatus described consists of two NMR spectrometers, Spectrometer A and Spectrometer B. Spectrometer B is the instrument that is pertinent to this case.

Spectrometer B included a pulse modulated transmitter, controlled by a pulse programmer, which in turn enables the programmer to execute an arbitrary pulse sequence. The Ellett transmitter was not intended to address the problem of ghosts or systematic noise, but it did have the capability to transmit pulses in relative phase quadrature. In fact, in one particular experiment, pulses were transmitted in the phase sequence 0°, 180°, 90°, 270°.

> The Ellett experiment generally worked by transmitting "bursts" of pulses. That is, a thousand or so pulses would be generated in one burst, and then the experiment would be performed again. Thus, the first burst could consist of a series of pulses in phase quadrature, and then, after an interval of time to detect a transient, the experimenter would send another burst. The bursts would not be in phase quadrature with each other.

*NRDC*, 822 F.Supp. at 1125. Although the successive bursts of pulses (within which there would be a series of pulses in phase quadrature) had exactly the same phase, "[t]he capabilities of the machine were such, . . ., that it could be programmed to transmit a series of successive pulses in phase quadrature, in the time intervals required to eliminate ghosts." *Id.*

In addition, the receiver used in Ellett disclosed all the elements of the receiver described in the Hoult patent. Furthermore, "Ellett had two detectors operable in quadrature phase, and in one particular experiment, diagrammed in the article, both detectors were turned on." *NRDC*, 822 F.Supp. at 1125.

However, the Ellett experiment was not designed in any way to address the prob-

lem sought to be solved by the Hoult invention. In other words, it would have required a special sophistication to look at Ellett and recognize that it could be programmed to transmit pulses in relative phase quadrature and could be used, by combining it with other technology, to solve the ghost problems.

*Id.* Moreover, because the Ellett experiment was not designed to achieve the same goal as the Hoult invention, the timing between the successive pulses in Ellett were very different than the timing required by the Hoult invention to between successive pulses.

### 3. Keller.

United States Patent No. 3,781,650 ("Keller" or the "Keller patent") was issued on December 25, 1973. The subject matter of this patent was a method and apparatus invented by a German scientist named Toni Keller for the purpose of eliminating what Dr. Hoult terms systematic noise.

Keller provides for a transmitter which sends successive pulses which are in phase opposition. In other words, the transmitter in Keller sends pulses of 0°, 180°, 0°, 180°. The detector disclosed by the Keller patent is a single-phase detector, as opposed to the quadrature phase detector disclosed in the Hoult patent. This means that, unlike spectrometers involving quadrature phase detection, when a transient response is received by the probe it is not split in two. Thus, there is only one signal received and stored as a result of each pulse.

To practice the Keller method, first one would apply the pulse at 0° phase. The single transient that results would be collected and put in a computer memory. After waiting for the nuclei in the sample to return to their initial alignment, the experiment would be repeated but with the pulse of the 180° phase. The transient that results from this pulse is then collected and subtracted from the transient from the 0° pulse that was stored in the computer memory. The result of this manipulation of the data is that the

two signals grow while the systematic noise is cancelled.

### II. Conclusions of Law.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a). Varian consented to personal jurisdiction for the purposes of this suit.

Varian, in its defense to NRDC's claim of infringement, challenges the validity of the Hoult patent. Because the invalidity or unenforceability of the Hoult patent would be a complete defense to NRDC's infringement claim, I will first address the issue of validity. Specifically, I will address whether claims 2 and 4 of the Hoult patent would have been obvious to a person of ordinary skill in the field of NMR.

#### A. Obviousness.

■ The patent statute provides that

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.

35 U.S.C. § 282. Furthermore, the statute squarely places the burden of proving facts establishing invalidity on the party who asserts invalidity. *Id.; Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed.Cir.1984). The patent challenger must establish those facts by clear and convincing evidence, and the ultimate determination is a conclusion of law based on those clearly and convincingly proven facts.

Section 103 of the patent statute provides in relevant part

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102[4] of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time

---

**4.** Section 102 provides in relevant part

A person shall be entitled to a patent unless—
(b) the invention was ... in public use or on sale in this country, more than one year prior

to the date of the application for patent in the United States.

35 U.S.C. § 102(b).

the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

■ "The ultimate legal conclusion of obviousness is a question of law." *Miles Laboratories, Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994) (citing *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 989 (Fed.Cir.1988)). *See also Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1965) ("the ultimate question of patent validity is one of law"). However, the analysis of obviousness rests on several factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art devices and the claimed invention; (3) the level of ordinary skill in the art; and (4) any other objective evidence of non-obviousness. *Miles Laboratories*, 997 F.2d at 877 (citing *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–94). Furthermore, the district court should make express factual findings concerning these inquiries. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 873 (Fed.Cir.1985) ("[The Federal Circuit] must be convinced from the opinion that the district court actually applies *Graham* and must be presented with enough express and necessarily implied findings to know the basis of the trial court's opinion.").

■ Based on these factual findings, the court must determine whether the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *See Graham*, 383 U.S. at 17, 86 S.Ct. at 693–94; 35 U.S.C. § 103. Although the claim must be considered as a whole, "the differences between the claim and the prior art need to be identified to place the obviousness analysis into proper perspective." *Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 717 (Fed.Cir.1991). However, the Federal Circuit has stated that "[f]ocusing on the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gil-*

*lette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed.Cir.1990) (citing *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383 (Fed.Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987)).

Furthermore, "[i]t is insufficient [for a finding of obviousness] that the prior art disclosed the components of the patented device, either separately or used in other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 934 (Fed.Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990) (citation omitted). However,

the suggestion to modify the art to produce the claimed invention need not be expressly stated in one or all of the references used to show obviousness. "Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."

*Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed.Cir.1985) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)).

In summary, the court must be "guided by the well-settled principles that the claimed invention must be considered as a whole, multiple cited prior art references must suggest the desirability of being combined, and the references must be viewed without the benefit of hindsight afforded by the disclosure." *In re Paulsen*, 30 F.3d 1475, 1482 (Fed.Cir.1994) (citation omitted).

I will now turn to the relevant factual inquiries.

■ *Scope and Content of Prior Art:* Section 103 does not, by its terms, define "prior art". However, the Federal Circuit has stated that "[t]he prior art is primarily comprised of references that are within the field of the inventor's endeavor." *Heidelberger Druckmaschinen v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1071 (Fed.Cir.1994). The Monsanto spectrometer, the Ellett reference, and the Keller patent are all within the field of Dr. Hoult's endeavor and are thus prior art. Indeed, the parties do

not dispute that these three references are in the prior art.

***Differences between Prior Art and Claimed Invention:*** Claims 2 and 4 of the Hoult patent disclose a specific combination of steps that, when used with practices common in the art, would eliminate the problem of systematic noise. This is accomplished through the use of a radio-frequency pulse transmitter which causes alternate pulses to be in phase opposition and also the use of a quadrature phase detector. Data routing of the detected signals is used to ensure that the data accumulates in the proper way. The detected signals which are in phase opposition are subtracted from each other thereby resulting in the cancellation of systematic noise. Hoult described these claims in his patent specification as follows:

A further advantage of shifting the transmitter phase occurs when the transmitter signal is shifted through 180°. This inverts the output signals and by subtracting the inverted signals from the original signal the systematic noise can be eliminated whilst the signal is increased.

**The Monsanto Spectrometer:** When comparing these claims to the Monsanto spectrometer, it is important to keep in mind that the Monsanto spectrometer has been held to embody the subject matter of claims 1 and 3 of the Hoult patent—the claims upon which claims 2 and 4 are dependent. *See NRDC,* 1994 WL 18963 at *3, *4 ("[i]t is undisputed that only the subject matter of claims 1 and 3 of the '118 patent was incorporated into the Monsanto spectrometer"); *NRDC,* 822 F.Supp. at 1126 ("The technology used by the Monsanto scientists is precisely what is covered by the Hoult patent."). This prior finding and the fact that claims 2 and 4 are dependent on claims 1 and 3 make clear what the differences are between the Monsanto spectrometer and claims 2 and 4. In fact, the language of the claims themselves makes clear what the differences are. Hoult claims in claims 2 and 4 of the patent

2. Nuclear magnetic resonance apparatus according to claim 1 [the subject matter of which was incorporated into the Monsanto spectrometer], wherein said transmitter means includes means for

causing alternate ones of said pulses to be in phase opposition.

. . . .

4. A method for use in the investigation of nuclear magnetic resonance according to claim 3 [the subject matter of which was incorporated into the Monsanto spectrometer] wherein said step of exciting includes the step of exciting alternate ones of said train of radio-frequency pulses in phase opposition.

Thus, the difference between the Monsanto spectrometer and claims 2 and 4 is that the transmitter in the Monsanto spectrometer did not cause alternate resonance signals to be excited in phase opposition (i.e., off by 180°), and thereafter, eliminate systematic noise in the manner described by Hoult. The pulses in the Monsanto spectrometer were only sent in the sequence of 0°, 90°, 0°, 90° and only eliminated the problem of ghosts. Other than these differences, the Monsanto spectrometer and claims 2 and 4 are exactly the same.

**Ellett:** Although in the prior opinion I stated that whether Ellett anticipated Hoult was a "close call", I found that Ellett did not anticipate Hoult. *See NRDC,* 822 F.Supp. at 1127–29. There are a couple of differences between Hoult and Ellett.

First, the experiment described in the Ellett reference involved successive bursts of pulses, each consisting of an alternating series of pulses, in phase quadrature with each other. A burst may consist of a thousand repetitions of 0°, 180°, 90°, 270°. The Ellett experiment repeated each burst without changing the phase. *See id.* at 1129. Claims 2 and 4, on the other hand, work by sending single pulse, rather than burst of pulses. The phase is changed for each successive pulse in a manner which results in alternate pulses being in phase opposition.

Another difference is timing. Claims 2 and 4 require the use of particular time intervals between pulses. Each time a pulse is sent, thereby exciting the specimen, enough time is waited to detect a transient, and then the phase is shifted. The times at issue in the Ellett experiment were much different. If the timing used in the Ellett

experiment were used to practice the Hoult patent, the Hoult patent would not work. Likewise, if the timing used to practice the Hoult patent were used in the Ellett experiment, Ellett would not work. This is not surprising given that Ellett was never meant as a means to eliminate either ghosts or systematic noise—the goal of the Ellett experiment was different.

One significant similarity between Ellett and claims 2 and 4 is that the capabilities of the spectrometer in Ellett "were such, . . ., that it could be programmed to transmit a series of successive pulses in phase quadrature. . . ." *NRDC*, 822 F.Supp. at 1125. Such a sequence of pulses could also cover claims 2 and 4 which requires alternate pulses to be in phase opposition. As Dr. Hoult makes clear in the specification to the patent, the sequence 0°, 90°, 180°, 270° covers both sets of claims. Successive pulses in this sequence are in relative phase quadrature, while alternate pulses are in phase opposition. Therefore, the spectrometer in Ellett had the capability of transmitting a sequence of pulses in which alternate ones would be in phase opposition. In addition, in one of the Ellett experiments, the successive bursts of pulses consisted of pulses in the sequence 0°, 180°, 90°, 270°. Although these pulses are not in the sequence 0°, 90°, 180°, 270°, this clearly demonstrates that the Ellett transmitter was capable of sending pulses in all four phases. Therefore, the Ellett transmitter was capable of transmitting pulses in the phases required by claims 2 and 4.

**Keller:** The most significant difference between claims 2 and 4 and Keller is that claims 2 and 4 involves QPD, while Keller involves a single-phase spectrometer. This means that, unlike spectrometers involving quadrature phase detection, when a transient response is received by a single phase detector it is not split into two signals. Thus, there is only one signal received and stored as a result of each pulse.

Quadrature phase detectors have certain advantages over single-phase detectors. For example, quadrature phase detectors improve the sensitivity of the spectrometer—in other words, it improves the spectrometer's ability to reject some of the random noise

and static. Also, quadrature phase detectors allow for the use of weaker radio transmitter frequency pulses, and thereby improves the accuracy of the spectrometer. For these reasons, quadrature phase detectors are considered an improvement upon single-phase detectors.

Despite the difference in detectors, claims 2 and 4 and Keller have much in common. Most significantly, both were intended to eliminate systematic noise (a problem common to both spectrometers with single-phase detectors and ones with quadrature phase detectors), and both did this by similar methods. At trial, Dr. Hoult described Keller's method as follows:

> You apply the pulse of zero degree phase, you collect the single transient that results and you put it in the computer memory. You wait, you repeat the experiment with the pulse of 180 degree phase and instead of adding that transient to the transient that's already in the memory, you subtract it from the transient that's already there. *You've inverted the phase of the pulse which has inverted the signal. So, by subtracting, the two signals grow, whereas the systematic noise is cancelled.*

Tr. at 505–06 (emphasis added). In the specification to his patent, Dr. Hoult summarizes claims 2 and 4 as follows:

> A further advantage of shifting the transmitter phase occurs when the transmitter signal is shifted through 180°. This inverts the output signals and by subtracting the inverted signals from the original signal the systematic noise can be eliminated whilst the signal is increased.

Hoult Patent col. 5, 1. 25–30. The two methods for eliminating systematic noise are substantially the same. This conclusion is further supported by the testimony of Varian's expert and NRDC's expert. Varian's expert stated at trial that the portion of the patent specification quoted immediately above is "exactly what the Keller patent teaches you." Tr. at 951. NRDC's expert stated at trial that Keller is "similar to what's added by [claims 2 and 4]." Tr. at 262.

The principal differences between Keller and claims 2 and 4 are (1) that Keller involved the use of a single-phase detector, while claims 2 and 4 involved quadrature phase detector and (2) Keller involved successive pulses in phase opposition, while claims 2 and 4 involved alternate pulses in phase opposition.

■ *Level of Ordinary Skill in the Art:* Determining the level of ordinary skill in the art is important because objectivity must be maintained when conducting the obviousness analysis. *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d at 718. "Instead of ascertaining what was subjectively obvious to the inventor at the time of invention, the court must ascertain what would have been objectively obvious to one of ordinary skill in the art at such time." *Id.* (citation omitted). In other words, the determination of whether or not an invention is obvious is "made from the viewpoint of the hypothetical person of ordinary skill in the field of the invention [at the time the invention was made]." *In re Raynes,* 7 F.3d 1037, 1039 (Fed.Cir.1993) (citations omitted).

■ Factors which are probative of the level of ordinary skill in the art include the educational level of the inventor, type of problems encountered in the art, prior art solutions, rapidity of innovation, sophistication of technology, and the educational level of those actively working in the field. *See id.* (citation omitted); *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 449–50 (Fed.Cir.1986), *cert. denied,* 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987) (citation omitted). The level of ordinary skill in the art in this case is extremely high. NMR technology is highly sophisticated, and as would be expected, the educational level of those who work in this field is correspondingly high. Ordinary workers in the field had a Ph.D. degree, or were candidates for a Ph.D. degree, in chemistry, physics, or electrical engineering, and typically had between five and fifteen years of experience working in the NMR spectrometry. Indeed, all of the major witnesses at trial fit this description.

■ *Objective Evidence of Non–Obviousness:* Objective evidence of non-obvious-ness, such as commercial success, long felt need for the invention, copying, and failure of others to invent, is relevant, and when present, must be considered. *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.,* 45 F.3d 1550, 1555 (Fed.Cir.1995) [hereinafter *Glaverbel* ] (citing *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed. Cir.1983)). However, while the presence of objective evidence would weigh in favor of non-obviousness, the lack of it does not weigh in favor of obviousness. *Miles Laboratories, Inc.,* 997 F.2d at 878 (citing, *e.g., Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955 (Fed.Cir.1986)).

■ When a patentee does offer objective evidence of non-obviousness, there must be a sufficient nexus between that evidence and the merits of the claimed invention. *In re Paulsen,* 30 F.3d at 1482 (citing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988)).

> The term "nexus" is used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness.

*Id.* (quoting *Demaco,* 851 F.2d at 1392). The burden of demonstrating the requisite nexus is on the patentee. *Id.*

There is no significant objective evidence of non-obviousness in this case. NRDC argues that the objective evidence of non-obviousness in this case includes Hoult's solution to a longstanding problem in the industry, Varian's inability to achieve an alternate design, Varian's copying, and commercial success. NRDC's argument fails however because it has not demonstrated the requisite nexus between this evidence and claims 2 and 4 specifically. There is evidence in the record which would arguably establish that Dr. Hoult's patent provided a solution to a longstanding problem, and that any proven success of the invention is attributable to that solution. However, most of this evidence deals with Dr. Hoult's solution to the problem of *ghosts—not systematic noise.*

The evidence dealing with the problems caused by systematic noise is not particularly indicative of non-obviousness because there is no evidence in the record of unsuccessful attempts by others to solve this problem. *See Minnesota Min. and Mfg. v. Johnson & Johnson*, 976 F.2d 1559, 1574 (Fed.Cir.1992) (stating that long-felt need is demonstrated by evidence of unsuccessful attempts to solve that problem); *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1567 (Fed.Cir.1984) (stating that copying of invention is evidence on non-obviousness particularly where "the copyist had itself attempted for a substantial length of time to design a similar device, and had failed"). In addition, there is evidence to the contrary—the Keller invention solved the problem of systematic noise in single-phase spectrometers. Lastly, the proposition that there was any long-felt need for a solution to the problem of systematic noise is undercut by the specification to the Hoult patent. In the specification, Dr. Hoult wrote that it was the ghost problem—not the systematic noise problem—"which has hitherto prevented the wide use of quadrature N.M.R. despite its considerable advantages over single-phase N.M.R." Hoult Patent at col. 3, 1. 5–15.

NRDC has not met its burden in demonstrating the requisite nexus between any objective evidence of the non-obviousness and the specific merits claims 2 and 4. Therefore, I find that there is no objective evidence of non-obviousness in this case.

With the answers to these factual inquiries in mind, the question is: Are the differences between the subject matter of claims 2 and 4 and the prior art such that claims 2 and 4 as a whole would have been obvious at the time of invention to a person of ordinary skill in the field of NMR?

Because claims 2 and 4 are dependent upon, and thus subsume, claims 1 and 3, which are embodied in the Monsanto spectrometer, a more useful way to phrase this question is: Given the prior art, would it have been obvious to a person of ordinary skill in the field of NMR at the time of invention to modify the transmitter in the Monsanto spectrometer to cause alternate pulses to be in phase opposition and to ma-nipulate the data as described in the patent to eliminate systematic noise?

The evidence in this case makes clear that the answer to this question is "yes".

The transmitter in the Monsanto spectrometer sent pulses in the sequence of 0°, 90°, 0°, 90°. The successive pulses in this sequence are in relative phase quadrature—there are no pulses in phase opposition, alternating or otherwise. The evidence at trial clearly indicates that it would have been obvious to a person of ordinary skill in the art how to modify the transmitter of the Monsanto spectrometer to send alternate pulses in phase opposition—assuming that person had the suggestion to do so. The following colloquy occurred at trial, between Varian's attorney and NRDC's expert:

Q: Now, have you agreed that it would have been obvious to modify Keller's transmitter to transmit pulses in phase quadrature and phase opposition if you had the suggestion to use Hoult's technique?

A: If you had the suggestion to use Hoult's technique you're asking would it have been obvious—

Q: Would it have been obvious to send all four phases in successive pulses in phase quadrature?

A: It would have been obvious *how to modify any transmitter.*

Tr. at 262 (emphasis added). Therefore, if one had the suggestion to send pulses in the sequence 0°, 90°, 180°, 270° (i.e., successive pulses in relative phase quadrature and alternate pulses in phase opposition), it would have been obvious how to modify any transmitter in such a way as to accomplish this.

This conclusion is further supported by the Ellett reference. In the previous opinion in this case, I found that the capabilities of the transmitter in the Ellett spectrometer "were such, ..., that it could be programmed to transmit a series of successive pulses in phase quadrature." *NRDC*, 822 F.Supp. at 1125. In addition, in one of the Ellett experiments, the successive bursts of pulses consisted of pulses in the sequence 0°, 180°, 90°, 270°. These facts clearly indicate that the ability to transmit pulses in covering all four phases (0°, 90°, 180°, 270°)—whatever the

sequence—is in the prior art. Therefore, Ellett also supports the conclusion that it would have been obvious to a person of ordinary skill in the field of NMR how to modify a transmitter to send pulses in a sequence in which alternate pulses are in phase opposition—if that person had the suggestion to do this.

The suggestion to do this is supplied by Keller. Keller has the same goal as claims 2 and 4, the elimination of systematic noise, and Keller accomplishes this by a similar method as claims 2 and 4.

A comparison of Dr. Hoult's testimony at trial and his patent specification makes the similarity between the two methods apparent. At trial, Dr. Hoult described Keller as follows:

> You apply the pulse of zero degree phase, you collect the single transient that results and you put it in the computer memory. You wait, you repeat the experiment with the pulse of 180 degree phase and instead of adding that transient to the transient that's already in the memory, you subtract it from the transient that's already there. *You've inverted the phase of the pulse which has inverted the signal. So, by subtracting, the two signals grow, whereas the systematic noise is cancelled.*

Tr. at 505–06 (emphasis added). In the specification to his patent, Dr. Hoult summarizes claims 2 and 4 as follows:

> A further advantage of shifting the transmitter phase occurs when the transmitter signal is shifted through 180°. *This inverts the output signals and by subtracting the inverted signals from the original signal the systematic noise can be eliminated whilst the signal is increased.*

Hoult Patent at Col. 5, 1. 25–30 (emphasis added). Thus, Keller clearly suggests the Hoult method for eliminating systematic noise (i.e., the subtraction of the signals that result from pulses in phase opposition). As discussed *supra,* this conclusion is also supported by the testimony of both NRDC's expert and Varian's expert.

NRDC makes several arguments as to why it would not have been obvious to combine the teachings of Keller with the Monsanto spectrometer.

First, NRDC relies on the finding of nonobviousness made by the re-examination patent examiner who had the Keller reference before him. Specifically, the examiner found that

> [t]he scope and content of the *Hoult claims 1–4* have not been met by Keller in view of Jeener or in view of Ellett prior art references. The teachings and motivation to combine these references to show the detecting of transient radio-frequency resonance signals excited in a specimen by a train of radio-frequency pulses in which successive ones are in relative phase quadrature is clearly absent from the record.

Defendant's Trial Exhibit 67 at 8 (emphasis added). Although I must give weight to the examiner's findings, this finding is inapposite to issue now before the court. The examiner found that claims 1–4 were not obvious. The issue now before the court only concerns the validity of claims 2 and 4. In addition, claims 1 and 3, in the form of the Monsanto spectrometer, are now prior art. Therefore, NRDC's reliance on the patent examiner's finding is misplaced.

Second, NRDC argues that it would not have been obvious to combine the teachings of Keller and the Monsanto spectrometer because Keller involved the use of a single-phase detector, while the Monsanto spectrometer involved a quadrature phase detector. This distinction does not render claims 2 and 4 non-obvious. While quadrature phase detection is considered an improvement on single phase detection, both are used for the same purpose (the analysis of materials to determine their components and molecular structure) and both experience problems with systematic noise. In addition, it must be remembered that the ordinary level of skill in the field of NMR is extremely high. If a person with this high level of skill were using a quadrature phase detector and were experiencing problems with systematic noise, it would have been obvious to that person at the time of invention to adapt the teachings of Keller to the Monsanto spectrometer. Keller teaches a method for eliminating systematic noise. In Keller, the sin-

gle transient that resulted from a pulse is subtracted from the transient that resulted from a pulse that was in phase opposition with it. To adapt this to the Monsanto spectrometer one would merely have to add pulses that are transmitted in phase opposition (as discussed *supra*, it would have been obvious how to do this) and subtract the two signals that result from each pulse due to the quadrature phase detector from the signals that result from pulses in phase opposition. It would have been obvious how to perform this subtraction given that the Monsanto spectrometer used addition and subtraction on the detected signals that resulted from pulses in relative phase quadrature to eliminate ghosts. For these reasons, NRDC's argument fails.

This conclusion is further supported by the fact that, in mid–1973 (prior to the filing of the Hoult patent), Dr. Codrington, Varian's expert, implemented Keller's technique in a quadrature phase detection NMR spectrometer. Although not the equivalent of prior art, "evidence of contemporaneous invention is probative of 'the level of knowledge in the art at the time the invention was made.'" *In re Merck & Co., Inc.*, 800 F.2d 1091, 1098 (Fed. Cir.1986) (quoting *In re Farrenkopf*, 713 F.2d 714, 720 (Fed.Cir.1983)). *See Phillips Petroleum Co. v. U.S. Steel Corp.*, 673 F.Supp. 1278, 1319 (D.Del.1987), *aff'd*, 865 F.2d 1247 (Fed.Cir.1989) (same); D. Chisum §§ 5.03[3][g], 5.05[7] ("Evidence that a number of persons, working under the same state of the prior art, arrived at the same or similar solutions to that embodied in a patent claim has been relied upon in a number of decisions as tending to show that the claim solution was obvious.") (citations omitted). *See also Davis v. Loesch*, 998 F.2d 963, 969–70 (Fed.Cir.1993). In his double CAPS work, Dr. Codrington sent pulses in the se-

quence 0°, 180°, 90°, 270°. The spectrometer Dr. Codrington used had quadrature phase detection. The use of this sequence corrected the problem of systematic noise.[5] While this work does not rise to the level of prior art, it is indicative of the level of skill in the art at the time of invention. In other words, this evidence indicates that the level of skill in the field of NMR at the time of invention was such that it would have been obvious to such a person to adapt the teachings of Keller to a spectrometer with quadrature phase detection.

NRDC also argues that it would not have been obvious to apply the teachings of Keller to the Monsanto spectrometer because Keller involved successive pulses in phase opposition, while the Monsanto spectrometer involved successive pulses in relative phase quadrature. NRDC's expert testified that order of the pulses is not important, as long as there are pulses with the requisite phases and as long as the detected signals are combined in the proper way.[6] In other words, the sequence of the pulses are not important as long as there are pulses in relative phase quadrature and pulses in phase opposition and the proper addition and subtraction is performed on the signals that result from these pulses. In addition, Ellett teaches that transmitters could be modified to send pulses both in phase quadrature and phase opposition. Therefore, the fact that the Monsanto spectrometer only transmitted pulses in phase quadrature and Keller only transmitted pulses in phase opposition does not support the proposition that it would not have been obvious to combine Keller with Monsanto.

In summary, the Monsanto spectrometer covers everything in claims 2 and 4 with two exceptions. One, the Monsanto spectrometer was never used to transmit pulses in phase

5. Dr. Codrington stated that this sequence would correct any "DC outset of the analogue to digital converter." Tr. at 751. This is the phrase Dr. Codrington uses for systematic noise. *See* Tr. at 734 (Dr. Codrington stated that if the Keller method was used "you could remove any DC unbalance in the analogue digital converter").

6. NRDC's expert testified that certain Varian products infringed the Hoult patent even though those products used the sequence 0°, 180°, 90°,

270°, rather than 0°, 90°, 180°, 270°. He stated that as long as the data were combined in the proper manner the result would be the same. *See* Tr. at 148–51. Because claims must be interpreted in the same way for determinations of validity as for determinations of infringement, *see Lemelson v. General Mills, Inc.*, 968 F.2d 1202, 1206, n. 4 (Fed.Cir.1992), this testimony is relevant to the determination of whether claims 2 and 4 would have been obvious.

opposition, and two, the Monsanto spectrometer was never used to eliminate systematic noise. The testimony of NRDC's expert and the fact that the spectrometer in Ellett was capable of sending of transmitting pulses in all four phases establishes that modifying the Monsanto spectrometer to enable its transmitter to send pulses in phase opposition would have been obvious to a person of ordinary skill in the field of NMR *if* that person had the suggestion to do so. Keller provides the suggestion; it teaches Hoult's method for eliminating systematic noise (i.e., the subtraction of the signals that result from pulses in phase opposition).

Thus, I find that the differences between the subject matter of claims 2 and 4 and the prior art such that claims 2 and 4 as a whole would have been obvious at the time of invention to a person of ordinary skill in the field of NMR. Therefore, I find that claims 2 and 4 are invalid.

### B. Other Issues.

In light of this finding, I need not address any of the other issues in this case.

### CONCLUSION

For the reasons detailed above, NRDC's claims against Varian are denied.